UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RONNIE HERNANDEZ                    )      NO. EDCV 08-1412 CT
                                    )
            Plaintiff,              )      OPINION AND ORDER
                                    )
      v.                            )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of                     )
Social Security,                    )
                                    )
                                    )
            Defendant.              )
_____)

      For the reasons set forth below, it is ordered that judgment be
entered in favor of defendant Commissioner of Social Security ("the
Commissioner") because the Commissioner's decision is supported by
substantial evidence and is free from material legal error.

                        SUMMARY OF PROCEEDINGS

      On October 9, 2008, Ronnie Hernandez ("plaintiff"), filed a
complaint seeking judicial review of the denial of benefits by the
Commissioner pursuant to the Social Security Act ("the Act").  The
parties filed a consent to proceed before the magistrate judge.  On
March 3, 2009, plaintiff filed a brief with points and authorities in
support of remand or reversal.  On April 2, 2009, the Commissioner filed

an opposition.

## SUMMARY OF ADMINISTRATIVE RECORD

### 1.  Proceedings

On December 2, 2004, plaintiff, who has self-reported history of drug and alcohol abuse, filed an application for Supplemental Security Income ("SSI"), alleging disability beginning January 1, 2003, due to depression, learning disability, and back and knee pain.  (TR 101-06.)[1] The application was denied initially and upon reconsideration.  (TR 29, 34.)

Plaintiff requested a hearing before an administrative law judge ("ALJ") and, on December 14, 2007, plaintiff, represented by an attorney, appeared and testified before an ALJ.  (TR 617-66.)  The ALJ also considered vocational expert ("VE") and medical expert ("ME") testimony.  On June 12, 2008, the ALJ issued a decision finding plaintiff was not disabled, as defined by the Act, and thus not eligible for benefits because he could do simple, routine, light work.  (TR 12-21.)  On June 23, 2008, plaintiff filed a request with the Social Security Appeals Council to review the ALJ's decision.  (TR 8.)  On September 10, 2008, the request was denied.  (TR 5.)  Accordingly, the ALJ's decision stands as the final decision of the Commissioner.

Plaintiff subsequently sought judicial review in this court.

### 2.  Summary Of The Evidence

The ALJ's decision is attached as an exhibit to this opinion and order and, except as otherwise noted, materially summarizes the evidence

---

[1]    "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

1 | in the case.

PLAINTIFF'S CONTENTIONS

Plaintiff contends that the ALJ erred because he did not:

1.   Properly consider the consultative examiner's opinion;

2.   Properly develop the record regarding plaintiff's learning disorder;

3.   Properly consider the lay witness testimony; and,

4.   Pose a complete hypothetical to the vocational expert.

STANDARD OF REVIEW

Under 42 U.S.C. §405(g), this court reviews the Commissioner's decision to determine if: (1) the Commissioner's findings are supported by substantial evidence; and, (2) the Commissioner used proper legal standards.   Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996). Substantial evidence means "more than a mere scintilla," but less than a preponderance.   Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

When the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, however, the Court may not substitute its judgment for that of the Commissioner.   Flaten v. Sec'y of Health and Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).

The court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405(g).

DISCUSSION

1.   The Sequential Evaluation

A person is "disabled" for the purpose of receiving social security benefits if he or she is unable to "engage in any substantial gainful

3

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

The Commissioner has established a five-step sequential evaluation for determining whether a person is disabled. First, it is determined whether the person is engaged in "substantial gainful activity." If so, benefits are denied.

Second, if the person is not so engaged, it is determined whether the person has a medically severe impairment or combination of impairments. If the person does not have a severe impairment or combination of impairments, benefits are denied.

Third, if the person has a severe impairment, it is determined whether the impairment meets or equals one of a number of "listed impairments." If the impairment meets or equals a "listed impairment," the person is conclusively presumed to be disabled.

Fourth, if the impairment does not meet or equal a "listed impairment," it is determined whether the impairment prevents the person from performing past relevant work. If the person can perform past relevant work, benefits are denied.

Fifth, if the person cannot perform past relevant work, the burden shifts to the Commissioner to show that the person is able to perform other kinds of work. The person is entitled to benefits only if the person is unable to perform other work. 20 C.F.R. §§404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

//

//

4

2.    <u>Issues</u>

   A.    <u>The consultative examiner's opinion and VE hypothetical</u>
         (Issues # 1 and # 4)

   Plaintiff contends the finding of non-disability was in error because the ALJ improperly "rejected" and failed to include in the VE hypothetical three findings of examining clinical psychologist William Soltz, Ph.D.

   While plaintiff is correct that the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician, and "specific and legitimate" reasons for rejecting a contradicted opinion, <u>see</u> <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995), the ALJ here did not reject Dr. Soltz's opinions.

   The ALJ asked the VE to consider a hypothetical individual with the following social and intellectual limitations:

- can work with objects, but not with people;
- cannot interact with the public;
- can only occasionally interact with co-workers;
- cannot interact intensely with anyone;
- cannot do security work or work that involves the safety of others;
- cannot exercise prolonged, focused concentration on detailed tasks;
- can perform only one task at a time;
- cannot undertake tasks that required hyper-vigilance; and,
- needs frequent supervision. (TR 664-65.)

   These limitations are, in fact, more restrictive than Dr. Soltz's diagnoses. (TR 613-15.) Plaintiff contends, nonetheless, that the ALJ rejected Dr. Soltz's diagnosis of "psychotic reaction NOS." Even assuming such a diagnosis would impose limitations beyond those proposed

5

1  to the VE, which this court does not, this misrepresents Dr. Soltz's
2  report.   Dr. Soltz opined that "I have **no** evidence at my disposal to
3  indicate that the patient is psychotic." (TR 614) (emphasis added).   At
4  most, he equivocated that he would "**Consider** psychotic reaction NOS (?)"
5  (TR 614) (question mark in original, emphasis added.)  Furthermore, the
6  medical record does not indicate plaintiff was otherwise diagnosed with
7  or treated psychosis.   (<u>See</u>, <u>e.g.</u>, TR 287, 293.)   The ALJ is not
8  obligated to adopt a doctor's tentative theory based upon "no" evidence.
9  <u>See</u> <u>Batson v. Commr. of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir.
10 2004)(ALJ did not err in giving treating physician's ultimate opinion
11 minimal weight in part because it was not based on supportive objective
12 evidence).

13      Similarly, plaintiff contends the ALJ improperly rejected Dr.
14 Soltz's diagnosis of "borderline intelligence by history and a learning
15 disability."   Again, even if this accurately reflects Dr. Soltz's
16 opinion, the VE hypotheticals encompass these limitations by limiting
17 plaintiff to simple, repetitive and one-step tasks requiring little
18 concentration or vigilance, but requiring frequent supervision.   The
19 court notes, moreover, that the doctor actually found: "borderline
20 intelligence by history; consider learning disability/unclearly defined
21 with no record."  A plain reading suggests that the doctor was reporting
22 what plaintiff told him - his history - about his intelligence and
23 learning abilities, and not affirmatively diagnosing him.  The remainder
24 of Dr. Soltz's report supports this reading.  While the doctor notes
25 that plaintiff's testing reflects borderline intelligence, he concludes
26 that "the test results here are not considered valid and reflect an
27 **underassessment** of [plaintiff's] capabilities" on the basis that
28                                    6

plaintiff was "likely malingering" and appeared to put forth "submaximal effort." (TR 613, 615)(emphasis added). Even assuming the medical report is inconclusive in this regard, the ALJ and not the court is tasked with evaluating the record and resolving such conflicts. <u>See Flaten v. Secy. of Health and Human Servs.</u>, 44 F.3d at 1463. The court will not disturb the ALJ's evidentiary findings that are based on substantial evidence.

Finally, Plaintiff contends the ALJ omitted Dr. Soltz's Axis V diagnosis without legally sufficient justification.[2] According to plaintiff, because Dr. Soltz provisionally assessed plaintiff with a GAF of 55, the ALJ's findings and the RFC should have included a consequent limitation for "moderate difficulty in social, occupational, or school functioning." (TR 613.) The court observes that they did so, as explained above.

Accordingly, the court finds that the ALJ's evaluation of Dr. Soltz's report and the RFC assessment are based on substantial evidence and free from material legal error.

## B. <u>Duty to develop the record</u> (Issue # 2)

Plaintiff next contends that the ALJ erred because he did not adequately develop the record regarding a possible learning disability,

---

[2] A GAF score is the fifth level ("axis") of the DSM-IV-TR multiaxial classification. The DSM-IV-TR is the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 2000), the manual that physicians, psychiatrists, psychologists, therapists, and social workers use to diagnose mental illness. The Axis V GAF score is used "for reporting the clinician's judgment of the individual's overall level of functioning." (DSM-IV-TR, p. 32.) The GAF scale is divided into 10 ranges of functioning on an overall scale of 0-100. (DSM-IV-TR, p. 34.)

7

1  for example by requesting school or medical records or holding the
2  record open for plaintiff to produce relevant records.

3      The ALJ's duty to "conduct an appropriate inquiry" is triggered
4  only if the evidence is ambiguous, or if the ALJ determines that the
5  record is inadequate for proper evaluation.  Tonapetyan v. Halter, 242
6  F.3d 1144, 1150 (9th Cir 2001).  In Tonapetnyan, for example, the ALJ
7  had a duty to develop the record because the medical expert, upon whose
8  testimony the ALJ relied heavily, had concluded that evidence regarding
9  the plaintiff's mental impairment was ambiguous.  Id.

10     Here, in contrast, the medical examiner, upon whom the ALJ relied
11 heavily (see TR 16), concluded that the evidence in the medical record
12 and his own observation of plaintiff at the hearing suggested there was
13 no such ambiguity, that plaintiff did not suffer a learning disability:
14 ME:      I guess all I can do is repeat what [examining clinical
15          psychologist] Dr. [Clifford] Taylor said . . . [plaintiff's]
16          responses to the questions on the IQ test certainly weren't
17          consistent with his functioning when Dr. Taylor sat down with
18          him.  And I think I would note the same thing with his
19          statements today.  Although he complains of memory problems,
20          when you ask for dates and specific information, he's able to
21          give that. . . .
22 ALJ:     Do you think the 60 scores that he had on the IQ's then are
23          invalid?
24 A:       Yes.
25     This colloquy, the reports of the examining physicians and

8

psychologists, and the fact that plaintiff earned his GED[3], suggest that any apparent ambiguity regarding a learning disability was created by plaintiff's intentional submaximal effort in intelligence testing, and thus did not trigger the ALJ's obligation to develop the record. As the medical examiner noted, Dr. Taylor and psychiatrist Linda Smith, M.D., both opined that plaintiff has higher cognitive functioning than his testing or subjective statements would suggest because he appeared to repeatedly manipulate the tests by performing below his abilities and by exaggerating his intellectual limitations. (See TR 613-15, 311, 530.)

Dr. Taylor noted that claimant is an "unreliable historian." He stated there were "inconsistencies in his presentation and test performance." (TR 311.) For example, the doctor noted, "[plaintiff] completed the history questionnaire form writing in full sentences, but scored in the mild range of mental retardation." (TR 311.)

In finding that plaintiff had no mental impairments at all, Dr. Smith noted that plaintiff "appeared to be of at least average intelligence" and that, because of this, he was "not credible" in his performance on a mental status exam. (TR 530.) She further noted that his performance on a memory test was "very, very typical for people who are attempting to stage a poor memory." (TR 530.)

Examining psychologist Dr. Soltz's similar conclusion, that plaintiff's intelligence test results were invalid and likely underassessed his abilities due to apparent submaximal effort, were discussed in the prior section. (See 613-15.)

Accordingly, the ALJ's evaluation of the evidence is supported by

_____

[3]   According to plaintiff, he completed the courses and testing for his GED while incarcerated. (TR 620.)

1  substantial evidence and free from material legal error.

2       C.  <u>Lay Witness Testimony (Issue #3)</u>

3      Plaintiff next contends the ALJ improperly discredited his mother's
4  third-party function reports. Plaintiff suggests the ALJ should have
5  credited his mother's statements of: sleeping problems; medical
6  problems; difficultly concentrating; inability to handle a savings
7  account, or to use checkbooks or money orders; and to the effect that
8  plaintiff's disabling condition limits his abilities to lift,
9  understand, bend, follow instructions, concentrate and get along with
10  others.  The court finds that the ALJ's evaluation of the mother's
11  statement was based on substantial evidence and not
12  materially erroneous.

13      The court observes, first, that the RFC and VE hypothetical both
14  include limitations on lifting, bending, understanding, following
15  instructions, concentration, and the inability to get along with others.
16  (See TR 17, 664-65.)

17      Furthermore, the ALJ was not required to credit or provide any
18  reason for discounting the mother's statements that plaintiff has
19  "sleeping problems" or particular "medical problems," although it does
20  not appear that they would, of themselves, impose additional limitations
21  on plaintiff beyond those reflected in the VE hypotheticals.  To the
22  extent a lay witness has opined a plaintiff has a particular medical
23  condition or is ultimately disabled, the ALJ may reject the testimony
24  without comment because such conclusions are beyond the competence of a
25  lay witness. <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984).

26      The court observes, additionally, that jobs the VE proposed for
27  plaintiff, small products assembler II, assembler in buttons and

28

1  notions, or optical assembly, would not require plaintiff to handle a
2  bank account, checkbook or money order.  See Dictionary of Occupational
3  Titles (4th Ed. 1991), §§ 739.687-030, 734.687-010, 713.687-018.  In any
4  event, the ALJ provided specific and germane reasons to the extent that
5  he discredited the mother's statements.  While an ALJ must consider lay
6  witness testimony about symptoms or their impact on the plaintiff's
7  life, he may discount that testimony if he finds and sets forth reasons
8  "germane" to that witness.  Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d
9  1050, 1053 (9th Cir. 2006)(emphasis in original).  Inconsistency with
10 medical evidence is one "germane" reason for discrediting the testimony
11 of a lay witness.  Bayliss v. Barnhart, 427 F. 3d 1211, 1218 (9th Cir.
12 2005).  A lay witness's "close relationship" with plaintiff and the
13 possibility that the relationship may influence the witness's desire to
14 help plaintiff is another.  Greger v. Barnhart, 464 F.3d 968, 972 (9th
15 Cir. 2006).

16      The ALJ found the mother's statements overall deserved little
17 weight because:
18 •     "Most importantly," they are "not consistent with the preponderance
19       of the opinions and observations of medical doctors in this case";
20 •     Her statements, specifically that plaintiff can walk five blocks
21       and do chores, are inconsistent with the record evidence, including
22       plaintiff's own statements that he can barely do either[4];
23 •     To the extent she made medical conclusions, she was not competent
24       to do so;

25 ───────────────
26      [4]  The court observes that the mother's statement that her
27 son rides a bicycle is also inconsistent with his claim of a
   disabling knee impairment.  (See TR 14, 113.)
28                                11

1 •     The mother is not a disinterested third party.  (TR 19.)

2      Accordingly, the credibility finding is supported by substantial

3 evidence and free from material legal error.

4                                           **CONCLUSION**

5      If the evidence can reasonably support either affirming or

6 reversing the Commissioner's conclusion, the court may not substitute

7 its judgment for that of the Commissioner.  <u>Flaten v. Sec'y of Health</u>

8 <u>and Human Servs.</u>, 44 F.3d at 1457.

9      After careful consideration of the record as a whole, the

10 magistrate judge concludes that the Commissioner's decision is supported

11 by substantial evidence and is free from material legal error.

12 Accordingly, it is ordered that judgment be entered in favor of the

13 Commissioner.

14 DATED: *April 13, 2009*

15                                  *Carolyn Turchin*

16                 CAROLYN TURCHIN
                UNITED STATES MAGISTRATE JUDGE

12

## SOCIAL SECURITY ADMINISTRATION
### Office of Disability Adjudication and Review

## DECISION

**IN THE CASE OF**                                           **CLAIM FOR**

Ronnie R Hernandez                                           Supplemental Security Income
_____                                       _____
(Claimant)

_____                                       _____
(Wage Earner)                                                (Social Security Number)

## JURISDICTION AND PROCEDURAL HISTORY

On December 13, 2005, the claimant filed an application for supplemental security income, alleging disability beginning January 1, 2003. The claim was denied initially on May 19, 2006, and upon reconsideration on January 26, 2007. Thereafter, the claimant filed a timely written request for hearing on January 30, 2007 (20 CFR 416.1429 *et seq.*). The claimant appeared and testified at a hearing held on December 14, 2007, in San Bernardino, CA. Also appearing and testifying were Michael Kania, Ph.D., an impartial medical expert and Sandra Fioretti, an impartial vocational expert. The claimant is represented by Bill Latour, an attorney.

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912(d).

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since December 13, 2005, the date the application was filed.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.



EXHIBIT

See Next Page

Ronnie R Hernandez (

**13**

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.



See Next Page

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant has not engaged in substantial gainful activity since December 13, 2005, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).**

**2.   The claimant has the following severe impairments: left knee derangement post surgery, antisocial personality disorder, and depression (20 CFR 416.920(c)).**

In December 2004 the claimant injured his left knee when he fell down a flight of stairs. An x-ray in January 2005 showed that he had tibial spine and lateral plateau avulsion fractures, and an MRI in February 2005 showed that he had a partial tear of the anterior cruciate ligament and a lateral meniscus tear. Exhibit 13F. The claimant was in jail at the time, and his knee was treated with pain medication. He also purchased a knee brace which he was allowed to wear in jail. In August 2005, it was noted that the claimant was using a cane, but his gait was fairly good and there was no edema. Exhibit 15F/24.

The claimant had arthroscopic surgery on his left knee in December 2007. In April 2008, the claimant was examined by Bunsri Sophon, M.D., who noted that the claimant reported he had not benefited from the surgery, and he complained of sharp, dull, and aching pain in the knee, and occasional locking of the knee joint. He claimed the pain was made worse by prolonged standing, walking, lifting, and bending. Dr. Sophon found that the claimant had swelling and tenderness over the suprapatellar and medial aspect of the left knee, and a mild limit on his range of motion. Dr. Sophon diagnosed osteoarthritis of the left knee and opined that the claimant could perform light work, which involved occasional lifting less than 25 pounds, frequent lifting or carrying of 10 pounds, sitting for 6 hours and standing/walking for 4 hours in an 8 hour workday and restrictions to occasional climbing, kneeling, squatting, and walking on uneven terrain. Exhibit 27F.

The claimant has a history of depression and suicidal ideation. He was in prison for 10 years after committing murder at the age of 15. In 2002, when the claimant was placed on parole after serving 2 years for assault with a deadly weapon, he was diagnosed with depression NOS;

See Next Page

**EXHIBIT**

alcohol dependences; antisocial personality disorder; and a GAF of 61.[1]  Exhibit 10F.  In February 2005, the claimant had a psychological examination done by Clifford Taylor, Ph.D., who found there were many inconsistencies between the claimant's presentation and his performance.  Dr. Taylor found that his testing was invalid because the claimant was exaggerating and malingering on his examinations.  Dr. Taylor found no evidence of impairment and diagnosed malingering.  He noted that the claimant's IQ appeared to be higher than his tests scores indicated because he had the ability to converse, drive and complete a questionnaire.  Exhibit 12F.

In January 2007, the claimant had a psychological examination done by Linda Smith, M.D., who noted that the claimant claimed to be bipolar, but she found no evidence to support that diagnosis.  Nor did she find evidence to support a diagnosis of depression.  Dr. Smith reported that the claimant was very vague about his symptoms and not very credible in his mental status exam.  She did find he had a substantial history of substance abuse, but he said he was no longer using.  Dr. Smith concluded that there was no evidence that the claimant had a psychiatric disorder, and she opined he was not impaired in his ability to work.  Exhibit 21F.

In April 2008, the claimant was examined by William Soltz, Ph.D., who noted that the claimant was being treated for depression.  His tests showed borderline intellectual functioning, but he found that the claimant performance indicated malingering, so the tests were unreliable.  He diagnosed characteristics of malingering; borderline intelligence by history; consider psychotic reaction NOS and learning disability; and a GAF of 55.[2]  He noted that the claimant seemed heavily medicated and he used a cane to walk although he did not appear to be limping.  Dr. Soltz found that the claimant put forth a submaximal effort which was consistent with previous examinations.  He opined that the claimant may be mild to moderately impaired in his ability to work with others, possibly due to his mental condition or his antisocial background.  Exhibit 28F.

There is also evidence that the claimant has suffered from back pain.  However, there is not objective medical evidence showing that this is a severe impairment.  Thus, the undersigned finds the claimant's back pain is not a severe impairment that causes significant limitations in the claimant's ability to perform basic work activities.

**3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

Listing section 1.02A requires that the claimant have a gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint confirmed by medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint, with involvement of one weight bearing peripheral

---

[1] A Global Assessment of Functioning (GAF) score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships.

[2] A Global Assessment of Functioning score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.



joint resulting in inability to ambulate effectively. There is evidence that the claimant's knee
continues to cause him pain, but he is able to ambulate effectively with the use of a cane. Thus,
the undersigned finds the claimant does not have a physical impairment or combination of
impairments that meets or medically equals one of the listed impairments.

The claimant's mental impairments, considered singly and in combination, do not meet or
medically equal the criteria of listings 12.04 or 12.08. In making this finding, the undersigned
has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B"
criteria, the mental impairments must result in at least two of the following: marked restriction of·
activities of daily living; marked difficulties in maintaining social functioning; marked
difficulties in maintaining concentration, persistence, or pace; or repeated episodes of
decompensation, each of extended duration. A marked limitation means more than moderate but
less than extreme. Repeated episodes of decompensation, each of extended duration. means
three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2
weeks.

The medical expert, Michael Kania, Ph.D., reviewed the medical record and testified that the
claimant's mental impairments did not meet or equal a listing. He opined that the claimant did
not have severe mental impairment; except possibly a personality disorder and depression for
which he was receiving treatment. Dr. Kania found that the claimant's statements were not
credible and his concentration was not as limited as he alleged. Dr. Kania opined that the
claimant should work with objects, not people, and he should have limited contact with
coworkers and the public.

With respect to the claimant's mental disorders under the B criteria of the mental listings, the
undersigned finds that the claimant has mild restriction of activities of daily living, moderate
difficulty in maintaining social functioning, moderate difficulties in maintaining concentration,
persistence, or pace, and no episodes of decompensation, each of extended duration. The
evidence does not establish the presence of the "C" criteria.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one
"marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are
not satisfied.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity
assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the
sequential evaluation process. The mental residual functional capacity assessment used at steps
4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing
various functions contained in the broad categories found in paragraph B of the adult mental
disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Accordingly, the
undersigned has translated the above "B" criteria findings into work-related functions in the
residual functional capacity assessment below.

**4.   After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform simple routine light work, which
involves occasional lifting less than 20 pounds, frequent lifting or carrying of 10 pounds,**



See Next Page

sitting for 6 hours and standing/walking for 4 hours in an 8 hour workday and having good use of his arms and hands. He can occasionally climb, balance, stoop, kneel, crouch, and crawl, but no climbing of ladder, ropes, or scaffolds, no hazards, unprotected heights, or extreme cold and no walking on uneven ground. He should not work where there are drugs and/or alcohol, or the safety of people involved. He should work with objects, not people, and he should have no intense interaction with others. He should have no contact with the public and only occasional contact with coworkers. He should not be required to be hyper-vigilant or do prolonged focus or concentration on detailed tasks, and he needs frequent supervision.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified that he got his GED and can read a little, but he can't write very well so he had to have help filling out forms. He said he stopped taking drugs in 1999, and stopped drinking in 2004. He said he hurt his knee in 2004 and had surgery on it in 2007. He said the surgery didn't help very much because his knee still hurts, so he wears a knee brace to walk, but he can't walk very far. He said he can't bend down all the way and can't play handball or football anymore. He said he did some physical therapy on his knee and can walk 2 blocks with his cane before he needs to rest. He said he doesn't do household chores or go out much, and mostly just watches TV. He said he can't sit very long or his back hurts, he can't lift anything, and he can only stand 10 minutes. He said he sees a psychiatrist every 2 weeks and his medications give him dry mouth.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

See Next Page



There are many inconsistencies between the claimant's statements and the objective medical evidence that undermine the claimant's credibility. The claimant testified that he can barely write and needs help with forms, but Dr. Taylor noted that the claimant completed a history questionnaire form by himself writing in full sentences. The claimant also told Dr. Taylor that he had no education beyond 8th grade and he had never use illicit drugs or had problems with alcohol. Exhibit 12F. However, the evidence shows that the claimant got his GED, he has a history of substance abuse. Exhibit 10F. The claimant reports that he reads and watches T.V. on a regular basis. The performance of these activities is inconsistent with a conclusion that the claimant does not have sufficient concentration, memory, persistence, or pace to perform the basic activities of work. Exhibit 13E. In addition, the claimant alleges very limited activities due to his knee, but the evidence indicates that he was riding his bike in June 2007, and got hit by a car. Exhibit 26F. The record also includes statements by doctors finding the claimant was engaging in malingering and misrepresentation. All of the doctors that did mental examinations of the claimant found it difficult to diagnose his mental condition because his malingering and underassessment of his capabilities invalidated their tests. Exhibit 12F, 21F, and 28F. Moreover, no treating physicians have found that the claimant was unable to work. The undersigned has fully considered all of the evidence submitted relating to the claimant's subjective complaints, including his activities of daily living, prior work record, precipitating and aggravating factors, effectiveness and use of medication and therapy, alleged and/or demonstrated functional restrictions, and the duration, frequency and intensity of the alleged symptoms. The undersigned finds that the claimant's statements are not credible. As the claimant's statements are not credible, his statements concerning his pain, his symptoms, and his limitations are not persuasive.

As for the opinion evidence, the undersigned gives weight to the opinions of the claimant's treating and examining physicians, and significant weight to the assessment done by Dr. Kania who was able to review the claimant's entire current medical record. The claimant's treatment notes show that he received treatment for bipolar disorder and antisocial traits and he did well on his medications. They also show the claimant's knee pain was treated with pain medications. There is no indication that the claimant was incapable of working. Exhibit 24F and 25F.

The residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also supported a finding of 'not disabled.' Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision). In December 2006, a Disability Determination Services (DDS) physician, P.V. Ombres, M.D., reviewed the medical evidence and found that the claimant had the physical residual functional capacity to perform the following tasks: occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk 6 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, push and pull without limitations, frequently climb, balance, stoop, kneel, crouch, crawl, occasionally climb ladders, ropes, scaffolding, avoid exposure to extreme cold and hazards, and otherwise function without medical impairment of physical abilities. Exhibit 18F. The Disability Determination Services

See Next Page



physicians who reviewed the claimant's mental impairments were unable to find any medically determinable mental impairments for the claimant. Exhibit 19F.

The statement of the claimant's mother was given little weight. The statement does not establish that the claimant is disabled since the witness is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms. Moreover, by virtue of the relationship as claimant's mother, the witness cannot be considered a disinterested third party witness whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Most importantly, significant weight cannot be given to the witness's statement because it, like the claimant's testimony, is simply not consistent with the preponderance of the opinions and observations by medical doctors in this case. Moreover, it is noted that the claimant's mother reported that the claimant was somewhat less impaired than the claimant alleged. She reported that he did household chores, could walk 5 blocks, and lift 25 pounds. Exhibit 12E.

The residual functional capacity above is consistent with the medical opinions, the supported subjective allegations and the objective medical evidence.

**5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).**

The claimant's past work as a line assembler, carpet cleaner, janitor, and landscaper required the ability to tolerate the full range of light to medium exertion. The undersigned has found, as outlined above, that the claimant retains the residual functional capacity for a reduced level of light work only. At the hearing, the vocational expert, Bill Floretta testified that with the residual functional capacity as determined, the claimant would be unable to return to any of his past relevant work. The undersigned finds Mr. Floretta's testimony persuasive and consistent with the evidence. Accordingly, the claimant is unable to perform past relevant work.

**6.    The claimant was born on November 6, 1970 and was 35 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

**7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).**

**8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in



Ronnie R Hernandez (          ).                                      Page 9 of 10

conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.
If the claimant can perform all or substantially all of the exertional demands at a given level of
exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled"
depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant
cannot perform substantially all of the exertional demands of work at a given level of exertion
and/or has nonexertional limitations, the medical-vocational rules are used as a framework for
decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering
the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the
claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational
Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a
finding of "not disabled" would be directed by Medical-Vocational Rule 202.21.  However, the
claimant's ability to perform all or substantially all of the requirements of this level of work has
been impeded by additional limitations.  To determine the extent to which these limitations erode
the unskilled light occupational base, the Administrative Law Judge asked the vocational expert
whether jobs exist in the national economy for an individual with the claimant's age, education,
work experience, and residual functional capacity.  The vocational expert testified that given all
of these factors the individual would be able to perform the requirements of representative
occupations such as small parts assembler (40,000 jobs nationally, 4,800 jobs regionally),
assembler in buttons and notions (16,000 jobs nationally, 1,200 jobs regionally) and optical
assembler (6,000 jobs nationally, 800 jobs regionally).

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information
contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the
claimant's age, education, work experience, and residual functional capacity, the claimant has
been capable of making a successful adjustment to other work that exists in significant numbers
in the national economy.  A finding of "not disabled" is therefore appropriate under the
framework of the above-cited rule.

**10.  The claimant has not been under a disability, as defined in the Social Security Act,
since December 13, 2005, the date the application was filed (20 CFR 416.920(g)).**

See Next Page



Ronnie R Hernandez (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)                    Page 10 of 10

**21**

## DECISION

Based on the application for supplemental security income filed on December 13, 2005, the
claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

_Gene Duncan_

Gene Duncan
Administrative Law Judge

061208

Date

